UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **FRIENDS OF ANTIMALS**, <br><br> Plaintiff, <br><br> v. <br><br> **KEVIN HAUGRUD, Acting Secretary of the Interior, et al.**[1] <br><br> Defendants. | Case No. 1:15-cv-01500 (CRC) |

## MEMORANDUM OPINION

The Bureau of Land Management ("BLM") is authorized to remove wild horses from public rangeland when it makes a determination that there is an overpopulation. Plaintiff Friends of Animals, a non-profit animal advocacy organization, challenges a July 2015 BLM decision authorizing the removal of all excess wild horses in Colorado's West Douglas Herd Area ("WDHA"), "beginning September 14, 2015 with 167 [horses]." A.R. 7964–70 (Decision Record for the 2015 WDHA Wild Horse Gather and Removal) ("WDHA Decision Record"). That initial 167-horse "gather" occurred nearly a year-and-a-half ago, but Plaintiff points to language in the decision appearing to authorize *future* WDHA gathers in contending that its challenge is not moot. Before conducting any further gathers, however, BLM will necessarily conduct at least some level of environmental analysis, issue public notice of the impending gather, and permit challenges to the decision administratively or in court, in accordance with its own agency guidance. This means Plaintiff will have an opportunity at a later date to bring its challenge when the issues are better fit for judicial consideration. In short, because Plaintiff's

---

[1] By operation of Fed. R. Civ. P. 25(d), the Acting Secretary of the Interior, as former Secretary Jewell's successor, has been "automatically substituted as a party."

challenge to the completed WDHA gather is moot, and its challenge to future WDHA gathers is not yet ripe, the Court will dismiss this case for lack of jurisdiction.

**I.   Background**

A.  Statutory Background

BLM is entrusted with managing the population of wild horses that roam public rangeland in the western United States.  Wild Free-Roaming Horses and Burros Act, 16 U.S.C. §§ 1331–40.  The Act provides that, when the Secretary determines that a designated herd management area is overpopulated and corrective action is necessary, "he shall immediately remove excess animals from the range . . . so as to restore a thriving natural ecological balance to the range, and protect the range from the deterioration associated with overpopulation[.]"  16 U.S.C. § 1333(b)(2).

Separately, the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 (2012), *et seq.*, "requires federal agencies to consider the environmental impact of any major federal action."  Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc., 462 U.S. 87, 89 (1983).  BLM recognizes that proposed horse gathers are subject to NEPA.  See BLM, Removal Manual, 4720.3 (2010).  Accordingly, when a gather is contemplated, the agency must examine, at least to some extent, the gather's expected environmental effects.  That examination can take on numerous forms.  When BLM is unable to identify any prior, relevant environmental analysis, it must prepare an Environmental Assessment ("EA") to determine if the action's expected effects are "significant."  See 40 C.F.R. § 1501.4.[2]  However, if the Bureau determines that a proposed

---

[2] If the effects are "significant," then the proposed action calls for a more thorough Environmental Impact Statement ("EIS").  See 42 U.S.C. § 4332(c); 40 C.F.R. § 1508.11.  If the likely effects are not considered "significant," then the agency will make a Finding of No Significant Impact ("FONSI") before carrying out the action.  See 40 C.F.R. § 1508.13.

2

gather is similar to a previous gather, BLM officials may prepare a Determination of NEPA Adequacy ("DNA"), confirming "that an action is adequately analyzed in existing NEPA document(s)." BLM, NEPA Handbook, H-1790-1 at 22 (2008). To issue a DNA, officials must complete an accompanying worksheet, answering a list of questions, such as: whether "the geographic and resource conditions are sufficiently similar to those analyzed in the existing NEPA documents," and whether "the existing analysis [is] valid in light of any new information or circumstances." Id. at 23.

BLM guidance further requires that, in addition to the above environmental analyses, certain notice and public comment procedures, as well as opportunities for administrative and judicial challenge, must accompany every planned gather. For instance, the public is afforded a 30-day period to review and comment on any EA or DNA issued for a particular gather plan. BLM, Removal Manual, 4720.35 (2010); see also A.R. 6331 (BLM Instruction Memorandum). And absent an emergency, "the authorized officer's [gather] decision shall be issued 31 to 76 days prior to the proposed gather start to provide an opportunity for administrative review of the decision." BLM, Removal Manual, 4720.36; see also A.R. 6408 (BLM Wild Horses Handbook, H-4700-1 at 48). Any party adversely affected by that decision may then challenge it administratively or in court. See A.R. 6410 (BLM Wild Horses Handbook, H-4700-1 at 50); 43 C.F.R. §§ 4.21, 4.410 & 4770.3.

B. Factual Background

The Wild River Resource Area, a large swath of public land located in northwest Colorado, includes the WDHA and the Piceance-East Douglas Herd Management Area

("PEDHMA"). See A.R. 8092 (BLM Map of Current Area Boundaries).³ Although the PEDHMA has been designated for wild horse management over the long term, with a current target population range of 135–235 horses, BLM has chosen not to maintain wild horses in the WDHA. See A.R. 8091. In February 2012, BLM conducted an aerial survey, and determined that there were a significant number of excess wild horses in both areas. A.R. 3713–19. In January 2015, BLM publicly proposed gathering 167 wild horses from the WDHA, and in April, BLM published a preliminary EA for that action. See A.R. 7981–82. A 30-day comment period followed, and over 10,000 comments were received. A.R. 7982.

After considering all comments, on July 28, 2015, BLM issued a final EA, a Finding of No New Significant Impact ("FONNSI"), and a Decision Record for the WDHA gather. A.R. 7964–70, 8195–99.⁴ The Decision Record specifically authorized a removal "beginning September 14, 2015 with 167 animals," but also indicated that BLM "would begin utilizing bait and water trapping gather methods to gather and remove excess wild horses from the WDHA as soon as funding is allocated and space is available at short and long-term holding facilities." A.R. 7964. The Decision Record further noted that BLM's Wild River Field Office "may also utilize helicopter gather methods in subsequent fiscal years to remove excess wild horses, [which] would likely be scheduled for a similar duration between July 1 and February 28." A.R.

---

³ For further background on BLM's efforts to manage wild horses in this area, see Colorado Wild Horse v. Jewell, 130 F. Supp. 3d 205, 209–10 (D.D.C. 2015).

⁴ On the same day, BLM issued a Decision Record for the PEDHMA gather, accompanied by a DNA rather than an EA, since the proposed gather was similar in scope to a previously analyzed gather in the same area. A.R. 8470–78. Plaintiff originally challenged the PEDHMA Decision Record as well, but now agrees with BLM that this claim is moot. See Pl.'s Reply Supp. MSJ ("Pl.'s Reply") 7. BLM concedes that the PEDHMA Decision Record authorized removals only to the extent that 167 horses could *not* be removed from the WDHA. See Def.'s Reply Supp. Cross-MSJ ("Def.'s Reply") 1 n.1. Because 167 horses *were* removed from the WDHA, the 2015 PEDHMA Decision Record does not authorize any further gathers in the PEDHMA. Id.

7964–65.  However, later in its discussion, the Decision Record characterized the relevant decision as one "to implement a gather to remove excess wild horses from within and immediately adjacent to the WDHA on approximately September 14, 2015."  A.R. 7968.

Friends of Animals challenges the WDHA Decision Record primarily on the grounds that BLM did not adequately evaluate or disclose relevant information regarding the gather's long-term impacts on the horses, making its Decision Record noncompliant with NEPA.  See Pl.'s Mem. Supp. Mot. Summ. J. ("Pl.'s MSJ") 10–15.  BLM disputes that assertion on the merits, but it also argues that the claim is not ripe for adjudication.  See Def.'s Mem. Supp. Cross-Mot. Summ. J. ("Def.'s Cross-MSJ") 14–16.  In particular, BLM maintains that any future gather would be subject to additional notice, comment, analysis, and judicial review procedures, meaning that Plaintiff would suffer no harm, and that the Court would benefit from a sharper, fuller development of the issues.  See id.; Def.'s Reply Supp. Cross-MSJ ("Def.'s Reply") 3–8.

**II.   Legal Standard**

This Court cannot reach the merits of a claim unless it is "constitutionally and prudentially ripe."  Wyoming Outdoor Council v. U.S. Forest Service, 165 F.3d 43, 48 (D.C. Cir. 1999) (quoting Louisiana Envtl. Action Network v. Browner, 87 F.3d 1379, 1381 (D.C. Cir. 1996)).  As for the constitutional component, just as "Article III jurisdiction bars disputes not involving injury-in-fact, the ripeness requirement excludes cases not involving present injury."  Wyoming Outdoor Council, 165 F.3d at 48.[5]  As a prudential matter, determining ripeness "requir[es] [a court] to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."  Abbott Labs. v. Gardner, 387 U.S.

---

[5] The parties have not separately briefed whether Plaintiff's claim is constitutionally ripe.  The Court's holding—that the claim is unripe as a prudential matter—makes it unnecessary to resolve this issue.

136, 149 (1967). In Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726 (1998), the Supreme Court articulated a three-factor framework for evaluating whether claims are prudentially ripe: Courts are to consider "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." Id. at 733.

### III. Analysis

Applying the Ohio Forestry framework, the Court first considers "whether delayed review would cause hardship to [Plaintiff]." 523 U.S. at 733. Generally speaking, hardship will establish ripeness only where "postponing review . . . impose[s] a hardship on the complaining party that is immediate, direct, and significant." Cronin v. FAA, 73 F.3d 1126, 1133 (D.C. Cir. 1996) (quoting State Farm Mut. Auto. Ins. Co. v. Dole, 802 F.2d 474, 480 (D.C. Cir. 1986)). Here, delayed review will most likely cause no hardship to Plaintiff because it will have an opportunity to bring its NEPA claim against BLM if and when the Bureau issues a decision to commence a future, date-specific gather. As discussed above, before BLM can conduct a future gather, it must provide notice of its decision "31 to 76 days prior to the proposed gather start to provide an opportunity for administrative review of the decision." BLM, Removal Manual, 4720.36; see also A.R. 6408 (BLM Wild Horses Handbook, H-4700-1 at 48). And it cannot be that the 2015 WDHA Decision Record *was* the required notice for all future gathers in the WDHA: Any notice provided in 2015 would have been issued far *more* than "76 days prior to [a hypothetical future] gather start." Id. Plaintiff, then, along with the rest of the public, will receive notice in the event of a future WDHA gather. At that point, Plaintiff may challenge it administratively or in court. See A.R. 6410 (BLM Wild Horses Handbook, H-4700-1 at 50); 43

C.F.R. §§ 4.21, 4.410 & 4770.3.  Because there will be both notice and an opportunity for judicial review, Plaintiff has demonstrated no hardship that would result from a delayed review.

The Court next considers "whether judicial intervention would inappropriately interfere with further administrative action."  Ohio Forestry, 523 U.S. at 733.  Where a court's review may "hinder agency efforts to refine its policies"—such as through revision or application of a long-term plan—judicial interference is inappropriate.  Id. at 735–36.  Here, BLM may very well revise its plan for the WDHA.  At the very least, prior to conducting a gather, it will complete a DNA, which entails some degree of environmental analysis.  See BLM, Removal Manual, 4720.3 (2010); BLM, NEPA Handbook, H-1790-1 at 23 (2008).  And if there have been significant "[c]hanges in numbers of [wild horses] since the previous gather that result in changes in forage utilization, use patterns, and/or ecological conditions and trends, or changing environmental conditions," then the Bureau will do a more thorough EA.  BLM, Wild Horses Handbook, H-4700-1, at 49.  Weighing in on the adequacy of the Bureau's NEPA analysis now would be premature in light of the possibility for such future analysis.

For similar reasons, the Court likely "would benefit from further factual development of the issues presented."  Ohio Forestry, 523 U.S. at 733.  Plaintiff contends that BLM failed to adequately consider and disclose relevant information—specifically, a single paper by Washington University School of Medicine professor Bruce Nock—regarding the potential long-term impacts of roundups on the health of horses.  See Pl.'s MSJ 10–15.  Since BLM will do at least some additional environmental analysis before commencing any future gather, the Bureau may eventually examine that very study (or others similar to it).  That analysis would aid the Court, "significantly advanc[ing] [its] ability to deal with the legal issues presented."  National

7

Park Hospitality Ass'n. v. Dept. of Interior, 538 U.S. 803, 804 (2003) (quoting Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 82 (1978)).

In short, all three Ohio Forestry factors indicate that Plaintiff's claim is not ripe. And Plaintiff offers no substantial arguments to the contrary. Instead, it presents two arguments aimed at distinguishing Ohio Forestry. First, Plaintiff argues that the case has no bearing here because it involved a land-management plan that set long-term goals without "authoriz[ing] any direct management action." Pl.'s Reply 2. However, it is far from clear that the challenged portion of the WDHA Decision Record, which is contingent on budget constraints and future analysis, resembles a "direct management action" more than it does a land-management plan. Even more to the point, this proposed dichotomy—between a land-management plan (challenges to which are unripe) and a "direct management action" (challenges to which are ripe)—was not the framework adopted by Ohio Forestry. Instead, the decision instructs courts to apply the three factors outlined above to any challenged agency action. As discussed, those factors point to the conclusion that Plaintiff's claim is not yet ripe.

Second, Plaintiff asserts that Ohio Forestry is distinguishable because it dealt with a "substantive" challenge, whereas Plaintiff's NEPA challenge is inherently procedural and therefore ripe as soon as there is error. See Pl.'s Reply 4. In support, Plaintiff relies on a passing comment in Ohio Forestry, to the effect that "a person complaining of a NEPA violation may complain of that failure at the time the failure takes place, for the claim can never get riper." 523 U.S. at 737. The D.C. Circuit, however, has since given this wording a much narrower interpretation than the one Plaintiff advances: In short, there can only be a NEPA "violation" (and a litigant may only "complain") when an agency has reached a "critical stage of a decision," Ctr. for Biological Diversity v. U.S. Dep't of Interior, 563 F.3d 466, 482 (D.C. Cir. 2009), i.e.,

where the agency has engaged in an "irreversible and irretrievable commitment[] of resources," Wyoming Outdoor Council, 165 F.3d at 49.  If it were instead as Plaintiff suggests, any NEPA claim would be automatically ripe.  But one need not look far for cases dismissing NEPA claims for lack of ripeness.  See, e.g., Ctr. for Sustainable Economy v. Jewell, 799 F.3d 588 (D.C. Cir. 2015); Ctr. for Biological Diversity, 563 F.3d 466; Wyo. Outdoor Council v. U.S. Forest Service, 165 F.3d 43.

Plaintiff will have its opportunity to challenge any future WDHA gathers.  If it chooses to bring such a challenge, the reviewing court will have the benefit of a fuller record and the context of a fact-specific roundup.  Those considerations require this Court's conclusion that this claim is not yet ripe for adjudication.

## IV. Conclusion

For the foregoing reasons, the Court concludes that Plaintiff's claim is not ripe.  The Court will therefore dismiss this case for lack of jurisdiction.  A separate order accompanies this opinion.

*Christopher R. Cooper*
CHRISTOPHER R. COOPER
United States District Judge

Date: February 21, 2017